## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JAMES E. JONES,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00012 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:  PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, James E. Jones, ("Jones"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jones protectively filed previous DIB and supplemental security income, ("SSI"), claims on June 6, 2013, alleging disability as of May 1, 2013, which were denied by decision dated March 4, 2016. (R. at 92-106.) Thereafter, this court upheld the decision denying benefits. *See Jones v. Berryhill*, Civil Action No. 2:17cv00024. Jones protectively filed his current application for DIB on June 12, 2017, alleging disability as of May 1, 2013, based on back pain and depression. (Record, ("R."), at 152, 313-14, 355, 390.) The claim was denied initially and upon reconsideration. (R. at 185-87, 191-93, 196-99, 201-03.) Jones then requested a hearing before an administrative law judge, ("ALJ"). (R. at 204-05.) The ALJ held a hearing on February 25, 2019, at which Jones was represented by counsel. (R. at 40-66.) On May 21, 2019, the ALJ rendered a partially favorable decision on Jones's claim, finding he was disabled beginning July 30, 2018. (R. at 152-66.) After the ALJ issued his decision, the Appeals Council, on its own motion, remanded Jones's claim for further review, by Order dated March 9, 2020.[2] (R. at

---

[2] The Appeals Council concluded the May 21, 2019, decision could not be effectuated as written because, although Jones was found disabled beginning July 30, 2018, he reached full retirement age within the five-month waiting period before a period of disability can be established under the Social Security regulations. (R. at 175-76.) Title 20 C.F.R. § 404.316 provides that a disabled person who has not reached full retirement age shall be entitled to DIB for each month beginning with the first month after his waiting period. Title 20 C.F.R. § 404.315 provides that the waiting period lasts five full consecutive months and begins with the first month the claimant is both insured and disabled. *See* Program Operations Manual System, ("POMS"), DI 10105.070, available at http://policy.ssa.gov/poms.nsf/lnx/0410105070 (effective Mar. 2, 2011). A period of disability ends the month before the month in which the claimant reaches full retirement age. *See* 20 C.F.R. § 404.321 (2021). Under the Social Security regulations, a person attains a particular

174-79.) Pursuant to this Order, the ALJ held another hearing on July 6, 2020, at which Jones, again, was represented by counsel. (R. at 68-88.)

By decision dated August 3, 2020, the ALJ denied Jones's claim. (R. at 14-33.) The ALJ found Jones met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2018. (R. at 16.) The ALJ found Jones had not engaged in substantial gainful activity since May 1, 2013, the alleged onset date. (R. at 16.) The ALJ determined Jones had severe impairments, namely lumbar degenerative disc disease, heart murmur, obesity and coronary artery disease, but he found Jones did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-22.) The ALJ found that, prior to July 30, 2018, the date Jones became disabled, he had the residual functional capacity to perform medium work,[3]

---

age on the day before his birthday, *see* 20 C.F.R. § 404.102 (2021), and for persons who attained age 62 between December 31, 2004, and January 1, 2017, like Jones, the full retirement age is 66. *See* 42 U.S.C. § 416(l)(1)(C). Here, because the ALJ found Jones's disability began on July 30, 2018, and he attained full retirement age on October 22, 2018, he reached full retirement age in only the third month of the five-month waiting period. Thus, the Appeals Council concluded Jones was not entitled to DIB based on a disability onset date of July 30, 2018, and, therefore, the ALJ erred in finding him entitled to benefits based on that date.

The Appeals Council instructed the ALJ, on remand, to (1) obtain additional evidence concerning Jones's impairments in order to complete the administrative record; (2) if necessary, obtain evidence from a medical expert to clarify the nature, severity, duration and limiting effects of Jones's impairments during the relevant period at issue; (3) give further consideration to Jones's maximum residual functional capacity during the period at issue; (4) obtain evidence from a vocational expert to determine whether Jones has acquired any skills that are transferable with very little, if any, vocational adjustment to other occupations under the guidelines in Social Security Ruling 82-41 and to clarify the effect of the assessed limitations on the claimant's occupational base; and (5) if the ALJ finds, once again, that Jones is disabled, he will find him entitled to a period of disability and disability insurance benefits only if five full consecutive months pass between his onset date and the date he attained full retirement age. (R. at 177-78.)

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2021).

except he could occasionally climb ramps and stairs, kneel, crouch and crawl; frequently stoop; and never climb ladders, ropes or scaffolds. (R. at 22.) The ALJ found that, beginning on July 30, 2018, Jones had the residual functional capacity to perform light work,[4] except he could frequently climb ramps and stairs and stoop; occasionally crawl and climb ladders, ropes and scaffolds; and he should avoid concentrated exposure to industrial hazards and vibration. (R. at 28.) The ALJ found that, prior to July 30, 2018, Jones was able to perform his past relevant work as a kitchen helper. (R. at 30.) However, beginning on July 30, 2018, Jones's residual functional capacity has prevented him from performing any past relevant work. (R. at 30.) Based on Jones's age, education, work history and residual functional capacity, prior to July 30, 2018, and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Jones could perform, including those of a brewery/distillery worker, hand packer and a pharmacy delivery driver. (R. at 31-32, 83-87.) Thus, the ALJ concluded Jones was not under a disability as defined by the Act prior to July 30, 2018, and he was not eligible for DIB benefits. (R. at 32-33.) *See* 20 C.F.R. § 404.1520(f), (g) (2021). The ALJ further concluded Jones became disabled on July 30, 2018, and continued to be disabled through the date of the decision, but he was not entitled to benefits because five full consecutive months did not pass between the claimant's onset date, July 30, 2018, and the date he attained full retirement age, October 22, 2018. (R. at 32-33.) *See* 20 C.F.R. §§ 404.315, 404.316, 404.320, 404.321 (2021); POMS DI 10105.070.

After the ALJ issued his decision, Jones pursued his administrative appeals, (R. at 448-50), but the Appeals Council denied his request for review. (R. at 1-5.)

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

Jones then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Jones's motion for summary judgment filed August 12, 2021, and the Commissioner's motion for summary judgment filed September 10, 2021.

## II. Facts[5]

Jones was born in 1952, (R. at 75, 313), which classifies him as a "person closely approaching retirement age" under 20 C.F.R. § 404.1563(e). He has a high school education[6] and past work experience as a kitchen helper, a highway maintenance worker and a janitor. (R. at 75, 83-84, 348.) At his February 25, 2019, hearing, Jones testified he had low back pain and spasms that radiated into both legs and, sometimes, into the hands. (R. at 48.) He said a combination of back pain and fatigue affected his ability to stand and walk. (R. at 48-49.) Jones estimated he could stand for 20 minutes and walk for 50 yards, which had been the case for three to four years. (R. at 49-50.) He estimated he could remain seated in a "work position" for 20 minutes due to back pain, and he stated he could not stoop, squat, bend and kneel due to both back pain and becoming quickly fatigued. (R. at 51, 53.) Jones testified he took methocarbamol for his back, which "hardly help[ed] at all," and he would lie down in a recliner for about five hours daily. (R. at 49-50.) He stated his back

---

[5] Because Jones filed a prior application for DIB, which was denied by decision dated March 4, 2016, this prior decision is res judicata as to the relevant time period to be considered. Thus, the question before this court is whether Jones was disabled at any time between March 5, 2016, the date following the ALJ's prior denial, and July 29, 2018, the day preceding the date the ALJ found Jones became disabled. Any facts included herein not directly related to this time period are included for clarity of the record. Moreover, Jones challenges the ALJ's findings only as they relate to his physical impairments. Thus, the court's discussion will be limited thereto.

[6] At his February 2019 hearing, Jones testified he completed the tenth grade, but he obtained a general education development, ("GED"), diploma. (R. at 44.)

pain had worsened since his prior 2016 hearing. (R. at 50.) Jones also testified he experienced numbness and tingling in his arms and fingers, preventing him from lifting more than 10 pounds and affecting his ability to grip and grasp objects. (R. at 51-52.) He said he had experienced these issues for two to five years, and they had worsened since his prior hearing. (R. at 51-52.) Jones testified he began experiencing chest pain and fatigue two and a half to three years previously, which had considerably worsened and had required a heart catheterization. (R. at 53.) He said that, since 2016, he had experienced chest pain off and on during the day and night, for which he used nitroglycerin daily. (R. at 53-54.) Jones testified he had daily dizziness and lightheadedness, not necessarily related to activity. (R. at 55.) Lastly, since 2016, he said he had been having daily leg cramps, mostly during the day, which his cardiologist said might be artery circulation problems. (R. at 56-57.)

At his July 2019 hearing, Jones testified he stopped working in 2014 due to back pain, difficulty lifting, bilateral arm and finger numbness, pain and numbness in both shoulders, difficulty gripping and difficulty standing for 20 minutes. (R. at 77-78.) He testified his back pain and difficulty using his upper extremities continued after he stopped working. (R. at 78-79.) After this time, he began experiencing daily fatigue and chest pain, but it took him a few months to see a cardiologist. (R. at 79.) Jones testified he would sit in his recliner to relieve his fatigue, which he estimated he was doing for five to five and one-half hours in an eight-hour period during 2017 and 2018. (R. at 79-80.) He stated this also helped his back pain and lower extremity pain. (R. at 80.) Jones estimated that, in 2017, he could stand and walk for 20 minutes before having to sit down due to fatigue and back pain. (R. at 80.) He testified he was having all these problems at the time of a consultative examination in October 2017, and he continued to have them up to the time of the hearing. (R. at 80-81.) Jones said his ability to sit, stand and walk at the

time of the hearing was about the same as it was in 2017. (R. at 81.) At the time of the hearing, he estimated he could lift and carry only 10 pounds occasionally due to his hand and finger numbness and back pain. (R. at 81.) Jones further estimated he could use his hands at chest or tabletop level to lift or move things for five to 10 minutes before experiencing numbness, and he would need to rest for 10 minutes before resuming. (R. at 81-82.) However, Jones testified he could not use his hands and arms to lift and carry 10 pounds for one-third of the workday. (R. at 82.) He testified he could not stoop, squat, bend and kneel for one-third of the workday due to back and knee pain. (R. at 82-83.) Jones testified he had experienced all these problems since at least 2017, and he continued to have them. (R. at 83.)

In an August 17, 2017, Function Report, Jones stated he watched television daily and checked the mail. (R. at 361.) He reported he could make sandwiches, he performed light house cleaning weekly, and he shopped in stores weekly. (R. at 361, 363-64.) Jones said he could go out alone and drive a car, and he stated he attended church services every other week. (R. at 364-65.) He reported difficulty putting on his shoes, and he stated he could not reach his back while bathing due to pain. (R. at 362.) Jones stated he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using his hands, concentrating and completing tasks. (R. at 366.) He estimated he could walk 40 yards before having to stop and rest for one hour. (R. at 366.) Jones reported daily use of a cane around his house, but it was not prescribed by a doctor. (R. at 367.)

In rendering his decision, the ALJ reviewed records from Norton Community Hospital; Wellmont Lonesome Pine Hospital; Appalachia Family Health; Mountain Home Veterans Affairs Medical Center, ("the VA"); Dr. Shaun Hines, D.O.; The Health Wagon; Hazard ARH Regional Medical Center; Mountain Heart Center,

PSC; James H. Quillen Veterans Affairs Medical Center, ("the VA"); B. Wayne Lanthorn, Ph.D.; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Manish Gambhir, M.D., a state agency physician; Patricia Bruner, Ph.D., a state agency psychologist; and Dr. Jack Hutcheson, M.D., a state agency physician.

Jones saw Dr. Shahab Ehtesham, M.D., at the VA on April 5, 2016, with complaints of nonradiating, lower back pain, which hurt most of the time and was aggravated by bending and lifting. (R. at 620.) He rated his pain as a six, and he stated it had been helped with naproxen in the past. (R. at 620.) He admitted smoking cigarettes, stating a pack lasted him four days. (R. at 621.) Jones denied chest pain, unusual shortness of breath, palpitations and increased edema. (R. at 621.) On examination, his blood pressure was 140/88; he was in no acute distress; he had a regular heart rate and rhythm, but a grade II early systolic murmur, loudest at the right second intercostal space, with no gallop or rub; lungs were clear; there was no extremity edema, and pulses were intact and symmetric; he had no focal deficit; gait and station were normal; motor strength was intact, as was sensation; there were no tremors; there was no synovitis or effusions; range of motion of the major joints was okay; there was no edema, redness or warmth; there was mild tenderness of the paravertebral muscles of the lumbosacral spine; straight leg raise testing was negative, bilaterally, as was FABER Test;[7] and sensorium was clear. (R. at 621-22.) A 12-lead electrocardiogram was abnormal, showing sinus bradycardia, sinus arrhythmia and nonspecific T-wave abnormality. (R. at 615.) Dr. Ehtesham noted no history of palpitations, blackouts or chest pain, but he diagnosed a grade II early systolic murmur, and he ordered a transthoracic echocardiogram. (R. at 622.) He

---

[7] FABER Test, also known as Patrick's Test, stands for Flexion, Abduction and External Rotation. These three combined movements result in a clinical pain provocation test to identify the presence of hip pathology by attempting to reproduce hip, lumbar or sacroiliac pain. *See* physio-pedia/FABER_Test (last visited Aug. 5, 2022).

also diagnosed chronic low back pain, and Jones agreed to a referral to the pain management clinic. (R. at 622.) Dr. Ehtesham encouraged routine exercise and smoking cessation, and he prescribed naproxen. (R. at 622-23.) The record shows that, despite multiple attempts to schedule the echocardiogram, Dr. Ehtesham was unable to contact Jones by phone, and Jones never responded to a letter sent to him. (R. at 616-17.) Thus, the consult was canceled. (R. at 617.)

On October 7, 2017, Jones saw Dr. Shaun Hines, D.O., for a consultative examination. (R. at 637-42.) Although Jones rated his pain as an eight on a 10-point scale, Dr. Hines stated he "appear[ed] to be in very little distress." (R. at 637.) He noted Jones was independent with his activities of daily living. (R. at 637.) On examination, Jones's blood pressure was 187/104; he was in no acute distress; respiratory and cardiovascular findings were normal; there was no edema, cyanosis or erythema of the extremities; he had no tender or trigger points; he had good muscle tone, and full strength, bilaterally, in all muscle groups; grip strength was full with fine motor movements, dexterity and ability to grasp objects, bilaterally; he had no abnormal reflexes, and sensation was intact throughout; gait and station were normal, but he was slow to rise from a sitting position, but without assistance; he was able to bend with mild difficulty; he had back pain after attempting to squat; he had no muscle asymmetry, atrophy or involuntary movements; and there was no musculoskeletal structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint. (R. at 637-39.)

Dr. Hines diagnosed low back pain secondary to disc disease, and he noted Jones's elevated blood pressure, which he advised him to recheck when he got home and to report to the emergency department if it remained elevated. (R. at 639.) Dr. Hines noted that, although Jones showed some obvious signs of joint tenderness in

the lumbar spine, there were no signs of joint instability, joint inflammation or joint deformity. (R. at 639.) He further noted Jones was able to sit in no significant distress, walk and stand in the office. (R. at 639.) Dr. Hines noted prior x-ray findings showing moderate and severe loss of disc space height at the L5-S1 level with sclerosis and vacuum phenomenon, as well as mild osteophyte formation. (R. at 639.) He found that Jones had normal range of motion in all joints. (R. at 641-42.) Dr. Hines concluded that, due to Jones's back pain, he was unlikely able to walk, and/or stand for a full workday, but he may be able to sit for a partial workday with allotted occasional breaks; because Jones's condition may be exacerbated by lifting or carrying excessive weight, he should be limited to less than 10 pounds; and he should refrain from excessive bending, stooping and crouching. (R. at 639-40.)

Dr. Manish Gambhir, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on October 16, 2017, in connection with the initial determination of Jones's claim. (R. at 123-24.) He opined Jones could perform light work, except he could stand and/or walk and sit for six hours each in an eight-hour workday; occasionally climb ladders, ropes and scaffolds and crawl; frequently climb ramps and stairs and stoop; and balance, kneel and crouch on an unlimited basis. (R. at 123.) Dr. Gambhir also opined Jones had no manipulative, visual or communicative limitations, but he should avoid concentrated exposure to vibration and hazards like machinery and heights. (R. at 124.) Dr. Gambhir based these limitations on Jones's degenerative changes in the lumbar spine. (R. at 123-24.) However, he noted Jones had an intact gait, neurological function and motor strength. (R. at 124.) On December 19, 2017, Dr. Jack Hutcheson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment in connection with the reconsideration of Jones's claim. (R. at 140-42.) Dr. Hutcheson's findings mirrored those of Dr. Gambhir's. (R. at 140-42.) He, like Dr.

Gambhir, also stated he was basing his limitations on degenerative changes in Jones's lumbar spine, but he noted Jones had an intact gait, neurological function and motor strength. (R. at 142.)

On April 19, 2018, Jones saw Rebecca Nicole Slone, R.N., a registered nurse at the VA, on a walk-in basis for complaints of increased lower back pain, which he rated as an eight to nine on a 10-point scale. (R. at 750.) Jones stated he did not have a current primary care provider and received treatment at the local emergency department on an as-needed basis. (R. at 750.) Although he stated he had used The Health Wagon in the past, he reported he had not been seen by any providers "in a while."[8] (R. at 750.) Jones reported he currently was working on obtaining disability for his back, which was getting progressively worse. (R. at 750.) Slone noted Jones's most recent back x-rays were performed by the VA in 2015, and Jones denied any other more recent imaging. (R. at 750.) These 2015 x-rays showed degenerative changes without acute bony abnormality. (R. at 750.) On examination, Jones's blood pressure was 141/80 and 149/91; he was in no acute distress; he had a normal gait; lungs were clear, and he denied recent shortness of breath; he had a normal heart rate and rhythm, and he denied chest pain; there was no tenderness to palpation; no swelling was noted to the bilateral lower extremities, and pulses were palpable and present to the bilateral lower extremities. (R. at 750.) Slone instructed Jones to keep an appointment the following week with Dr. Ehtesham, and she further instructed him he may use Tylenol/ibuprofen, heat, ice and rest for pain relief. (R. at 750.)

On April 23, 2018, Jones presented to The Health Wagon with complaints of lower back pain and spasms. (R. at 648.) He stated he was told he had a heart murmur

---

[8] The record shows that, with the exception of the October 2017 consultative examination, Jones had not sought medical care since his April 5, 2016, visit to the VA. (R. at 620, 750.)

when he was 23 years old.[9] (R. at 648.) Jones denied fatigue, chest pain and shortness of breath. (R. at 648.) On examination, his blood pressure was 180/108; he was in no acute distress; he had a grade III systolic murmur[10] at the left sternal border; lungs were clear, bilaterally; and he had lower back tenderness, and he was slow and rigid during movements. (R. at 649.) Henry Price Viers, N.P.-C, a certified nurse practitioner, diagnosed essential hypertension; low back pain; and an unspecified cardiac murmur. (R. at 649.) He was given Clonidine in the clinic for hypertension, which reduced Jones's blood pressure to a safe level, and Viers prescribed Norvasc. (R. at 649.) They discussed the possibility of seeing a cardiologist or undergoing an echocardiogram in the future to evaluate his heart murmur. (R. at 649.) Viers prescribed Flexeril for low back pain, and he ordered various lab work. (R. at 649.) Jones returned on April 30, 2018, to discuss his hypertension medications and follow up on his lab work. (R. at 646.) He denied any medication side effects. (R. at 646.) Although Jones's blood pressure remained elevated at 148/83, it was improved since his prior visit. (R. at 646.) His examination was normal, including a regular heart rate and rhythm with no murmur; clear lungs, bilaterally; and no extremity edema. (R. at 646.) Viers continued to diagnose essential hypertension, he continued Norvasc, and he added hydrochlorothiazide. (R. at 647.) On June 8, 2018, Jones's blood pressure was 140/78, although he reported his systolic readings at home had been in the 130s. (R. at 644.) He denied chest pain, shortness of breath and palpitations. (R. at 644.) On examination, he was in no acute distress; he had a grade II to III systolic murmur, most notable at the fourth and fifth intercostal spaces; lungs were clear, bilaterally; and there was no edema of the extremities. (R. at 644.) Viers

---

[9] This is the only mention of a prior diagnosis of a heart murmur in the treatment records during the relevant time period.

[10] A grade III heart murmur is loud, but without a palpable thrill. *See* medlineplus.gov/ency/article/003266.htm (last visited Aug. 5, 2022).

diagnosed essential hypertension; low back pain; unspecified cardiac murmur; and hypercholesterolemia. (R. at 645.) He continued Norvasc and hydrochlorothiazide for hypertension; he prescribed 800 mg ibuprofen for low back pain; he advised Jones to keep an upcoming appointment with a cardiologist; he advised him to continue his statin medication prescribed by his VA provider; and he discussed dietary modifications for cholesterol control. (R. at 645.)

Jones saw Dr. Padubidri S. Chandrashekar, M.D., a cardiologist at Mountain Heart Center, PSC, on May 31, 2018, for chest pain associated with shortness of breath, increasing fatigue, decreased effort tolerance, dizziness with lightheadedness and palpitations. (R. at 720.) Jones also endorsed fluid accumulation in the legs. (R. at 721.) Dr. Chandrashekar noted Jones was a heavy smoker who quit smoking only two weeks previously. (R. at 720.) Jones's blood pressure was 143/87; he was in no acute distress; he had a grade II systolic murmur at the Erb's point;[11] lungs were clear, bilaterally; there was no clubbing, cyanosis or edema of the extremities; he had normal motor strength in all extremities; and sensation was intact. (R. at 720-21.) Dr. Chandrashekar diagnosed chest pain; unspecified heart murmur; shortness of breath; palpitations; fatigue; dizziness; hyperlipidemia; essential hypertension; family history of ischemic heart disease and other diseases of the circulatory system; morbid obesity; uncomplicated nicotine dependence; and unspecified chronic kidney disease. (R. at 721.) He recommended an echocardiogram and stress study, as well as a Holter monitor. (R. at 721-22.) Dr. Chandrashekar also ordered lipid testing, and he counseled Jones in dietary management. (R. at 722.) The echocardiogram showed normal left ventricular size and systolic function; left

---

[11] Erb's point is the auscultation location for heart sounds and heart murmurs located at the third intercostal space and the left lower sternal border. *See* healio.com/cardiology/learn-the-heart/cardiology-review/topic-reviews/erbs-point (last visited Aug. 5, 2022).

ventricular ejection fraction of greater than 60 percent; normal left atrium; no significant regional wall motion abnormalities; moderately calcified aortic valve without significant aortic valve stenosis; mild pulmonary hypertension; and no pericardial effusion. (R. at 724-25.) Dr. Chandrashekar noted he could not confidently exclude a bicuspid aortic valve, but he also noted the Doppler was suboptimal to accurately estimate Jones's aortic valve area, and it was an extremely suboptimal study due to a poor acoustic window. (R. at 725.) The Holter monitor showed no evidence of significant atrial or ventricular cardiac arrhythmia. (R. at 726.)

Jones returned on June 5, 2018, at which time his blood pressure was 139/74. (R. at 717.) His physical examination was unchanged, as were Dr. Chandrashekar's diagnoses. (R. at 717-18.) Dr. Chandrashekar recommended a stress study and a cardiac catheterization. (R. at 718.) A myocardial perfusion stress study was performed on July 12, 2018, and showed evidence of a small area of reversible ischemia in the inferior wall of the left ventricle. (R. at 731.) Jones experienced chest pain and shortness of breath during infusion. (R. at 731.) He had normal left ventricular systolic function with a calculated left ventricular ejection fraction of 60 percent, and stress gated images revealed normal wall motion and no discernable evidence for regional or global wall motion abnormality. (R. at 731.) Baseline EKG was normal sinus with right bundle branch block and was unchanged post-infusion. (R. at 731.) There was no evidence of arrhythmias, and there was normal blood pressure response at peak infusion. (R. at 731.) A cardiac catheterization was recommended only if clinically indicated and if symptoms warranted for a more definitive delineation of coronary anatomy. (R. at 731.)

On July 30, 2018, Jones underwent a diagnostic left heart catheterization by Dr. Chandrashekar, with the following reasons listed: unstable angina; Canadian Cardiovascular Society Functional Classification, ("CCS Functional Class"), III;[12] Thrombolysis in Myocardial Infarction, ("TIMI"), risk score 5;[13] hypertension; dyslipidemia; heavy smoker, quit smoking two months ago; chronic renal failure; morbid obesity with BMI of 30; and family history of premature coronary artery disease. (R. at 732.) This catheterization revealed noncritical, nonobstructive coronary artery disease; a normal left ventricular contractility with estimated ejection fraction of 60 percent; no significant mitral valve prolapse or regurgitation; and no significant gradient across the aortic valve on pullback. (R. at 711, 734.) Dr. Chandrashekar noted that, given the catheterization findings, he would consider noncardiac etiologies of Jones's symptoms. (R. at 711.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62

---

[12] A Cardiac Cath Lab Functional Classification form, dated July 30, 2018, and signed by Dr. Chandrashekar, indicates that CCS Functional Class III for angina reflects marked limitation of ordinary activities, such as walking one to two blocks or climbing stairs under normal circumstances. (R. at 689.) The CCS angina classification is a physician-reported symptom severity scale used to assess and grade physical activity symptoms on four levels. Class I indicates angina with serious exertion; Class II indicates angina with walking more than 200 yards on flat surfaces, climbing stairs rapidly or in cold or emotional situations; Class III indicates angina with walking 100 to 200 yards on flat surfaces; and class IV indicates angina at rest or with any physical activity. *See* ahajournals.org/doi/10.1161/JAHA.119.012811 (last visited Aug. 5, 2022). Thus, the CCS Functional Class levels reflect the types of activities that trigger an individual's angina.

[13] A TIMI risk score is based on a number of factors and is used to estimate how likely it is that someone might have serious or life-threatening heart consequences. The TIMI score can range from zero to seven. Scores from zero to two represent a low risk, three to five an intermediate risk and six to seven a high risk. *See* webmd.com/heart-disease/what-timi-risk-score (last visited Aug. 5, 2022).

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jones argues the ALJ erred by finding he was not disabled prior to July 30, 2018. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) In particular, he argues the ALJ improperly determined his residual functional capacity prior to July 30, 2018, by rejecting the opinions of Drs. Hines, Chandrashekar, Gambhir and Hutcheson. (Plaintiff's Brief at 5-6.)

Jones filed his application in June 2017; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[14] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective

---

[14] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[15] *See* 20 C.F.R. § 4041520c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found that, prior to July 30, 2018, the period at issue here, Jones had the residual functional capacity to perform medium work, except he could occasionally climb ramps and stairs, kneel, crouch and crawl; frequently stoop; and never climb ladders, ropes or scaffolds. (R. at 22.)

The court first notes Jones's contention that the ALJ rejected the opinions of Drs. Hines, Chandrashekar, Gambhir and Hutcheson with "a summary sentence stating [they] were 'unpersuasive.'" This simply is not true. In fact, the ALJ embarked on a thorough discussion of his evaluation of the persuasive value of each of these opinions. For the following reasons, I find this evaluation was appropriate pursuant to the regulations, and the ALJ's residual functional capacity finding and

---

[15] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

resulting disability finding for the period from March 5, 2016, to July 29, 2018, is supported by substantial evidence.

In making his residual functional capacity finding, the ALJ found Dr. Hines's opinion that Jones could not walk or stand for a full workday, but could sit for a partial workday with allotted occasional breaks, that Jones was limited to lifting and carrying less than 10 pounds because his condition would be exacerbated by lifting/carrying and that Jones should refrain from excessive bending, stooping and crouching was unpersuasive. (R. at 27.) In support of this finding, the ALJ stated Dr. Hines's opinion was vague and inconsistent with the record, which supported a medium residual functional capacity prior to July 30, 2018, given Jones's routine treatment and minimal abnormalities following examination. (R. at 27.) In particular, the ALJ correctly noted Dr. Ehtesham's April 5, 2016, treatment note, showing Jones had only mild tenderness in the lumbar paravertebral muscles, but he had a normal gait and station, negative straight leg raise testing, bilaterally, intact motor strength and sensation, an "okay" range of motion in all major joints, he was in no acute distress, he had no edema, and he had no focal neurological deficit. (R. at 27.) Additionally, the ALJ correctly noted that, prior to July 30, 2018, Jones received minimal treatment, consisting only of NSAID and muscle relaxant medication management, and he did not undergo physical therapy, receive injections or seek a surgical consultation. (R. at 27.) Finally, the ALJ also correctly noted that the record reflects a nearly two-year gap in treatment from May 2016 through March 2018, notwithstanding the October 2017 consultative examination, suggesting stability in Jones's condition. (R. at 27.)

In addition to being inconsistent with the record, the ALJ also found Dr. Hines's opinion was not well-supported because his own examination revealed only

minimal abnormalities. (R. at 27.) Specifically, he noted that Dr. Hines found Jones had a normal range of motion of the lumbar spine, as well as in all the extremities, no muscle atrophy, structural deformity or effusion, normal strength, intact sensation, a normal gait, negative straight leg raise testing and no abnormal reflexes. (R. at 27.) Although Dr. Hines noted Jones had mild difficulty with bending, pain with squatting, and he was slow to rise from a seated position, he did not require any assistance. (R. at 27.) Further, Dr. Hines indicated Jones was able to sit in no significant distress, walk and stand in the office. (R. at 27.) Lastly, the ALJ found that Dr. Hines appeared to base his limitations on Jones's subjective pain descriptions, as Jones rated his pain an eight on a 10-point scale, but Dr. Hines reported he appeared to be in very mild distress. (R. at 27.)

Next, the ALJ, likewise, found the opinion of Dr. Chandrashekar, Jones's cardiologist, unpersuasive for the period prior to July 30, 2018. (R. at 27.) Dr. Chandrashekar opined Jones was CCS Functional Class III, which is defined as angina resulting in marked limitations in ordinary activities, such as walking one to two blocks or climbing stairs. (R. at 27.) However, the ALJ found that the evidence of record prior to July 30, 2018, was inconsistent with this opinion. (R. at 27.) Specifically, he noted that, on April 5, 2016, Dr. Ehtesham referred Jones for a transthoracic echocardiogram, but the consult was canceled after several failed attempts were made to contact Jones to schedule this appointment. (R. at 27.) The ALJ further noted that Jones did not begin to report cardiac symptoms until May 31, 2018, and he denied chest pain or shortness or breath as late as April 2018. (R. at 27.) In fact, the court notes that the June 8, 2018, treatment note from The Health Wagon also indicates Jones denied chest pain, shortness of breath and palpitations. (R. at 644.) During the October 7, 2017, consultative examination with Dr. Hines, Jones did not report any cardiac associated limitations, such as fatigue, chest pain or

shortness of breath. (R. at 27.) Additionally, the ALJ found the CCS Functional Class limitation to be very vague, as it did not provide specific functional restrictions. (R. at 27.) As stated herein, the CSS Functional Class levels indicate the types of activities that trigger an individual's angina. They are not a traditional functional capacity evaluation, placing specific restrictions on an individual's work-related abilities. Lastly, the ALJ found this opinion was unpersuasive because Dr. Chandrashekar found Jones's chest pain was not cardiac in nature and intended to consider other etiologies in light of his noncritical, nonobstructive coronary artery disease. (R. at 27.) This is supported by the diagnostic left heart catheterization performed on July 30, 2018.

Finally, the ALJ found the opinions of Drs. Gambhir and Hutcheson, the state agency physicians, unpersuasive. They both opined, in October and December 2017, respectively, that Jones could perform light work, except he could occasionally climb ladders, ropes and scaffolds and crawl; frequently climb ramps and stairs and stoop; balance, kneel and crouch on an unlimited basis; and avoid concentrated exposure to vibration and hazards like machinery and heights. (R. at 123-24, 140-41.) The ALJ found that these opinions were inconsistent with the evidence of record. (R. at 27.) For example, he noted the April 5, 2016, examination findings of Dr. Ehtesham, including only mild tenderness in the lumbar paravertebral muscles and that Jones had a normal gait and station, negative straight leg raise testing, bilaterally, intact motor and sensory functioning, an "okay" range of motion in all major joints, he was in no acute distress, and he had no edema or focal neurological deficit. (R. at 27.) The ALJ further noted that, in October 2017, the same month Dr. Gambhir rendered his opinion and just two months before Dr. Hutcheson rendered his, Dr. Hines found a normal range of motion in the lumbar spine and all extremities, without muscle atrophy, structural deformity or effusion, normal muscle

strength, intact sensation, normal gait, negative straight leg raise testing and no abnormal reflexes. (R. at 27.) Dr. Hines further indicated Jones had only mild difficulty with bending, pain with squatting, and he was slow to rise from a seated position, but he did not require assistance. (R. at 27.) Moreover, the ALJ noted Jones's minimal treatment up until July 30, 2018, consisting only of NSAID and muscle relaxant medication management. (R. at 27.) Lastly, the ALJ stated the state agency physicians' opinions was inconsistent with the record, which did not show a significant change from the prior decision to warrant reducing Jones to light work prior to the established onset date. (R. at 27.) In support of this, the ALJ again noted that Jones typically had normal examinations, and he underwent only routine, conservative treatment. (R. at 27.) In addition to being inconsistent with the evidence of record, the ALJ found these opinions not well-supported. (R. at 27.) Specifically, the ALJ stated that Drs. Gambhir and Hutcheson stated their opinions were based on Jones's lumbar degenerative changes, but they also noted he presented with an intact gait, neurological function and motor strength. (R. at 27.)

Based on all the above, I find substantial evidence exists to support the ALJ's consideration of the medical opinion evidence, as well as his residual functional capacity finding and ultimate disability finding for the period from March 5, 2016, to July 29, 2018.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's

consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding for the period from March 5, 2016, to July 29, 2018; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Jones was not disabled under the Act and was not entitled to DIB benefits for the period from March 5, 2016, to July 29, 2018.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jones's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 5, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE